IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PEDRO RIOS, Administrator of the Estate of PEDRO RIOS, JR., deceased,<br><br>                                      Plaintiff,<br>v.<br><br>CITY OF CHICAGO, a municipal corporation, NICHOLAS REDELSPERGER and ERIC BELLOMY,<br><br>                                    Defendants. | Case No. 15 CV 03119<br><br>Honorable Jorge L. Alonso |

## MEMORANDUM OPINION AND ORDER

In this civil rights case brought pursuant to 42 U.S.C. § 1983 and Illinois law, plaintiff Pedro Rios asserts claims of excessive force, failure to intervene, and wrongful death against the City of Chicago and certain Chicago police officers, one of whom shot and killed his son. Defendants move for summary judgment. For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

Plaintiff's fourteen-year-old son, Pedro Rios, Jr. ("Rios") was walking through Chicago's Portage Park neighborhood shortly before 10 p.m. on July 4, 2014, carrying something tucked into his basketball shorts. As Rios crossed North Cicero Avenue on West Berenice Avenue, he passed in front of a southbound Chicago Police Department Chevy Tahoe. Inside the Tahoe were defendant Chicago police officers Nicholas Redelsperger and Eric Bellomy, who were on patrol. According to the officers, they observed that Rios (then unknown to them) appeared to be attempting to hold or conceal something beneath his clothing as he crossed the street in front of them. The officers believed based on the body language that Rios was concealing contraband,

likely a weapon. Officer Bellomy turned the vehicle to pull up beside Rios and attempted to speak with him. Rios ignored the officers' requests to stop and continued walking eastward along Berenice. Officer Redelsperger stepped out of the Tahoe and commanded Rios to stop. Rios did not stop and instead started to run eastward on the north sidewalk of Berenice, alongside the premises of Alert Protective Services, situated at the northeast corner of Berenice and Cicero. Officer Redelsperger gave chase on foot.

Video from security cameras in the area shows much of what followed. A camera ("Camera 8") perched near the southeast corner of Alert Protective Services, facing west along Berenice, shows Rios running eastward along the sidewalk toward the camera, with Officer Redelsperger in pursuit. At one point just after he starts to run, in video taken simultaneously by another camera ("Camera 6") positioned nearer to Cicero, Rios appears to be clutching something in or near the waistband of his basketball shorts. In the video from Camera 8, Rios continues running east along the sidewalk, and Officer Redelsperger appears to draw his weapon while pursuing him. Rios passes under Camera 8 and out of view of any of the cameras, then reappears approximately 1.5 seconds later in video taken from a camera ("Camera 2") trained on the alley behind Alert Protective Services. When he comes into view of Camera 2, Rios is falling to the ground, and an object falls from his person. He rolls, gets up, and continues running northward in the alley, perpendicular to Berenice and parallel to Cicero, out of the shot of Camera 2 and into view of "Camera 4." Camera 4 shows Officer Bellomy, still driving the Tahoe, accelerate into the alley and swerve in front of Rios, blocking his path and knocking him to the ground. Meanwhile, Officer Redelsperger comes into view of Camera 2, picks up the object, and follows Rios and Bellomy northward into the alley. Rios rises, charges toward Redelsperger, collides with him, and both fall backward. Rios does not rise again.

2

The object that Rios had been carrying, that he lost in the alley when he fell, and that Officer Redelsperger recovered was a large silver revolver, a .44 Magnum Ruger Super Redhawk. According to Officer Redelsperger, after Rios began to run away from him, Rios continued clutching the right side of his body with his right hand. Officer Redelsperger testified at his deposition that, as Rios approached approximately the middle of the Alert Protective Services building, he saw Rios's left hand cross his body and transfer a large revolver into his right hand while he continued to run eastbound on Berenice. (Pl.'s LR 56.1 Resp. ¶ 39, ECF No. 132.) According to Officer Redelsperger, he saw Rios's body start to turn to the right while raising the gun in the direction of Redelsperger. (*Id.* ¶ 46.) Fearing that Rios would fire, Redelsperger fired a shot at him. Rios continued to run away, turning north into the alley. Redelsperger continued to pursue him, and when he reached the southeast corner of the Alert Protective Services building, he testified, he saw Rios turn to his left and point the gun at him again. (Defs.' LR 56.1 Resp. ¶ 25, ECF No. 142.) As he stood near the corner of the building, Redelsperger fired two more shots at Rios. (*Id.*; *see* Pl.'s LR 56.1 Resp. ¶ 56.) Following the shots, Rios fell, losing the handgun, rolled, and ran northward into the alley.

The parties dispute the details of precisely when and where Redelsperger fired the shots and Rios was struck, but it is undisputed that Redelsperger fired three shots, and two of them struck Rios. The first struck him in the left upper back and exited through his left upper shoulder area. The second entered Rios's right lower back above his right hip and lodged in the upper left lobe of Rios's lungs. (*See* Defs.' Reply Br. at 10, ECF No. 140.) Rios died at the scene.

Plaintiff's expert, Dr. Simms, opines that Officer Redelsperger's description of the chase and of how he fired when Rios turned his body toward Redelsperger is inconsistent with the wound paths. (Defs.' LR 56.1 Resp. ¶¶ 41-43.) In particular, according to Dr. Simms, the first shot seems

to have occurred while Rios was upright and running squarely away from Redelsperger, and the second occurred while Rios was falling or had fallen, with his body essentially horizontal; the wound paths could not have occurred, Dr. Simms opines, while Rios was upright and turned either to the left or right. (*Id.*)

## ANALYSIS

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). The Court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013). The Court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016).

"Section 1983 creates a 'species of tort liability,'" *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 916 (2017) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 417 (1976)), against any person who,

4

under color of state law, "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution," 42 U.S.C. § 1983. "The Fourth Amendment protects '[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures.'" *Manuel*, 137 S. Ct. at 917 (quoting U.S. Const. amend. IV). "'A person is seized' whenever officials "restrain[ ] his freedom of movement.'" *Manuel*, 137 S. Ct. at 917 (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)). "A police officer's use of deadly force constitutes a seizure within the meaning of the Fourth Amendment, and therefore it must be reasonable." *Scott v. Edinburg*, 346 F.3d 752, 756 (7th Cir. 2003).

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). In assessing whether an officer used excessive force, courts will consider the totality of the circumstances and analyze the actions of the officer objectively, from "'the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Weinmann v. McClone*, 787 F.3d 444, 448-49 (7th Cir. 2015) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014)). Courts must also "'allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Weinmann*, 787 F.3d at 449 (quoting *Plumhoff*, 572 U.S. at 775).

"[A] person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force." *Weinmann*, 787 F.3d at 448 (citing *Graham* and

5

*Garner*). "Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Garner*, 471 U.S. at 11-12.

### A. Excessive Force

The core of plaintiff's complaint is that Redelsperger used excessive force by shooting Rios in the back as he ran away, under circumstances in which Redelsperger had no reason to fear that Rios was a threat to anyone. Defendants argue that they are entitled to summary judgment because Redelsperger has testified that he only shot Rios after Rios put him in fear for his life by pointing the revolver toward him, which justified the shooting. According to defendants, plaintiff has no evidence to the contrary, as the security video and other evidence is at least consistent with Redelsperger's story, so summary judgment is warranted in their favor. Defendants argue that, while plaintiff may be unwilling to accept Redelsperger's account of the incident, "the only person in a good position to offer evidence contradicting the police account is dead," and mere speculation that Redelsperger might be lying is not enough to overcome summary judgment. *See Gysan v. Francisko*, 965 F.3d 567, 570 (7th Cir. 2020) (citing *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 985 (7th Cir. 2020)).

While it is true that plaintiff must come forward with evidence supporting his claims, rather than rely on mere speculation, the Court does not agree that plaintiff has produced no such evidence here. In an excessive force case, when "'the person most likely to rebut the officers' version of events'" is a deceased victim who therefore "'can't testify,'" principles of "fairness" require courts to "scrutinize all the evidence to determine whether the officers' story is consistent with other known facts." *King*, 954 F.3d at 985 (quoting *Cruz v. City of Anaheim*, 765 F.3d 1076,

6

1079 (9th Cir. 2014) and citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994), *cert. denied*, 515 U.S. 1159 (1995) ("In other words, the court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.")). The security video and the wound path evidence, taken together, amount to circumstantial evidence on which a reasonable factfinder could rely to reject Redelsperger's account of the incident and conclude that he acted unreasonably.

Although Redelsperger claims to have noticed almost immediately that Rios appeared to be concealing some sort of "contraband, likely a weapon," in his clothing (*see* Pl.'s LR 56.1 Resp. ¶¶ 24-25), he does not claim to have known, rather than merely surmised, that it was a weapon until, he says, he saw Rios manipulate the revolver during the chase along Berenice (*id.* ¶¶ 39-40). Both sides point to the security video on this point: defendants claim that it bears out Redelsperger's story, whereas plaintiff claims that it does the opposite because it does not show Rios drawing or holding a gun. Given the limited clarity of the video, it is difficult to tell which side, if either, is correct. At this stage of proceedings, the Court need only ask if any reasonable juror could see it the way plaintiff does, and, on the Court's viewing, the answer is yes. A reasonable juror could conclude that, even if the footage does appear to show Rios clutching at his body and perhaps concealing something in his waistband as he starts to run, it also appears to show him run squarely away from Redelsperger, pumping both arms in a normal and natural gait, without turning toward Redelsperger and without drawing the weapon at any point until he passes under Camera 8 and into the blind spot. There are a couple of light spots that appear and disappear on Rios's body that defendants insist are the glint of a weapon, but the footage is hardly conclusive,

7

and even if these light spots are the glint of a weapon, a juror could conclude from their position and Rios's pumping arms that the gun is not in Rios's hand but tucked into his waistband where Redelsperger could not see it. At no point does it appear so clearly that no reasonable juror could conclude otherwise that Rios was drawing a weapon or holding one in his hand in a way that would allow Redelsperger to identify it as a weapon from behind, as he said he did.

    A juror who viewed the footage in that way, concluding that Rios did not draw his weapon while in view of Camera 8 along Berenice, might then ask whether Rios could have drawn the weapon, turned around, and pointed the weapon at Redelsperger, and Redelsperger could have recognized Rios's revolver, fired his own weapon, and hit Rios, all in the approximately 1.5 seconds that Rios is in the blind spot between the viewing angles of Cameras 8 and 2. Potentially casting doubt on any such conclusion would be the wound path evidence, which defendants admit tends to show that the first shot hit Rios while he was upright and squarely running away from Redelsperger, not turned toward him to point his revolver at him. Further, the second shot appears to have entered the right lower back and lodged in the upper left lobe of Rios's lung, which, a juror could conclude, seems unlikely to have happened while Rios was turned to his left to point the gun at Redelsperger, as Redelsperger described.

    Casting further doubt might be the fact that Redelsperger testified that Rios pointed the gun at him once while turned to the right on the sidewalk, causing Redelsperger to fire to protect himself, then again while turned to the left in the alley, causing Redelsperger to fire a second and third time. A juror might conclude that the video does not show Rios turning, so if he did it at all he did it in the blind spot, and even if Rios had time to turn and threaten Redelsperger with the weapon once while in the blind spot, it is unlikely that he was able to do it twice, first to one side, drawing fire, and then to the other, drawing fire again, all during a mere 1.5 seconds. And a juror

8

who rejects part of Redelsperger's testimony as incredible might conclude that he should reject all of it. *Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1063-64 (7th Cir. 2018) (Hamilton, J., dissenting in part) (recognizing "'general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt'") (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000)); *see also Brown v. Blanchard*, 31 F. Supp. 3d 1003, 1009-10 (E.D. Wis. 2014) ("If the jury decides that the deputies are not being truthful about certain matters concerning the shooting, they may choose to disbelieve other parts of their testimony about what happened during the shooting, including their claim that Brown advanced on them with an upraised knife.") (citing *Muhammed v. City of Chicago,* 316 F.3d 680, 683-84 (7th Cir.2002) and *United States v. Edwards,* 581 F.3d 604, 612 (7th Cir.2009)), *aff'd on other grounds sub nom. Williams v. Ind. State Police Dep't*, 797 F.3d 468 (7th Cir. 2015).

In short, a reasonable juror could conclude that Redelsperger's use of deadly force was not reasonable under the circumstances because she could reasonably find that (1) the video shows Rios to be running away from Redelsperger without drawing or pointing a weapon, and (2) the circumstantial evidence (including, in particular, the video and the wound path evidence) shows Redelsperger's account of the incident to be incredible. The parties raise and discuss numerous other evidentiary details that might further inform the jury's decision, but the Court need go no farther because the above suffices to demonstrate that there is a genuine issue of material fact. Defendants are not entitled to summary judgment on defendants' § 1983 excessive force claim because there is sufficient evidence to support a verdict for plaintiff.

### B. Qualified Immunity

Defendants contend that even if a reasonable juror could conclude that Redelsperger used excessive force under the circumstances, they are still entitled to summary judgment on grounds

9

of qualified immunity. Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (reversing denial of qualified immunity in an excessive force case).

When considering whether a constitutional right is clearly established, a court must not define the right at a high level of generality; rather "the clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 139 S.Ct. 500, 503 (2019). The Supreme Court has explained the applicable principles as follows:

> "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (*per curiam*). Although "this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White* [*v. Pauly,* 137 S.Ct. 548, 551 (2017) (*per curiam*)] ((internal quotation marks omitted). . . . Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. *Mullenix*, 577 U.S. at 13. . . . "Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers." *White,* 137 S.Ct. at 552 (internal quotation marks omitted). But the general rules set forth in "*Garner* and *Graham* do not by themselves create clearly established law outside an 'obvious case.'" *Id.* (quoting *Brosseau*, 543 U.S. at 199). Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 572 U.S. at 778-79.

*Kisela v. Hughes*, 138 S. Ct. 1148, 1152-53 (2018) (internal citations altered).

In *Emmons*, the Supreme Court noted that it has "'stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment'" before ruling that an officer is not entitled to qualified immunity. *Emmons*, 139 S.Ct. at 504

(quoting *District of Columbia v. Wesby*, 138 S.Ct. 577, 590 (2018)). It is the plaintiff's burden to show that a right is clearly established. *See Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018); *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994)

Qualified-immunity analysis "usually entails a two-step inquiry," in which the court determines "(1) whether the facts alleged or shown by the plaintiff establish a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct." *Dockery*, 911 F.3d at 466 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The Court has already performed the first step, and it has concluded that there is a genuine issue of material fact as to whether Redelsperger used excessive force in violation of Rios's constitutional rights, so it must advance to the second step. Defendants argue that the law had not clearly established that, under the circumstances Redelsperger faced on July 4, 2014, in his pursuit of Rios down Berenice and toward the alley, shooting Rios amounted to excessive force.

The trouble with defendants' argument is that they assume throughout their briefs that no jury could fail to find that Redelsperger knew or had reason to fear that plaintiff had a gun. But, as the Court has already explained, viewing the facts in the light most favorable to plaintiff, a jury could indeed find otherwise: while the video does seem to show Rios fumble with something and clutch it to his body as he starts to run, a reasonable juror could conclude that, after that moment, there is no gun in his hand and he pumps his arms in a normal running motion, with the gun apparently securely tucked into his waistband, as he flees. A juror who so interprets the video footage and who finds Redelsperger not credible based on inconsistencies between his testimony and the circumstantial evidence could conclude that the gun remained tucked in Rios's waistband until he fell in the alley. If so, then Redelsperger knew only that Rios was running with something

11

that he did not want to show to police, without any particular reason to believe it was a weapon other than his own intuition.

If that is the jury's finding, then Redelsperger is not entitled to qualified immunity because he had no reason to believe that Rios was a threat to him or the community, so he was not entitled to use deadly force to stop him from fleeing. "It is well-established—and has been since long before the shooting at issue here[1]—that 'a person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force.'" *Williams*, 797 F.3d at 484 (quoting *Weinmann,* 787 F.3d at 448). "Deadly force may be used if the officer has probable cause to believe that the armed suspect (1) 'poses a threat of serious physical harm, either to the officer or to others,' or (2) 'committed a crime involving the infliction or threatened infliction of serious physical harm' and is about to escape." *Muhammed v. City of Chicago,* 316 F.3d 680, 683 (7th Cir. 2002) (quoting *Garner,* 471 U.S. at 11-12). Under this well-established rule, it was clear on July 4, 2014, that a law enforcement officer may not reasonably shoot a suspect merely because he is fleeing from police, if the officer lacks any reason to believe that the suspect poses a threat to police or the public or has committed a crime of threatened or actual physical harm. *See Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("If [the plaintiff's] account is to be believed, [the officer] shot him in the back without any indication that he had committed a violent felony or was dangerous. That would make the force used to seize [the plaintiff] excessive under the Fourth Amendment."); *Estate of Starks v. Enyart*, 5 F.3d 230, 233-34 (7th Cir. 1993) (where the officers knew that a suspect was attempting to flee police but his "underlying crime [had not been]

---

[1] The shooting the Seventh Circuit was addressing in this passage from *Williams* took place in 2012.

accomplished violently," fact dispute as to whether he threatened police during his escape precluded ruling on qualified immunity at summary judgment); *see also Childs v. City of Chicago*, No. 13-CV-7541, 2017 WL 1151049, at *9 (N.D. Ill. Mar. 28, 2017) (officer was not entitled to qualified immunity at summary judgment on excessive force claim stemming from 2012 incident because, viewed favorably to plaintiff, there was evidence to support finding that the officer did not have reason to know that the plaintiff had a gun or was dangerous before the officer shot the fleeing plaintiff in the back of the head) (citing *Garner*, 471 U.S. at 11 ("It is not better that all felony suspects die than that they escape.")); *see also Taylor v. Riojas*, 141 S. Ct. 52, 52-54 (2020) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (explaining that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to specific conduct in question") (internal quotation marks omitted)).

Plaintiff argues in the alternative that, even if Redelsperger had somehow been able to see Rios's revolver, Redelsperger is still not entitled to summary judgment, under *George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013), in which the Ninth Circuit held that the officers were not entitled to qualified immunity at summary judgment because there was a fact dispute over whether the officers shot plaintiff's decedent while he has holding a gun harmlessly at his side, rather than raising it to threaten officers. Under *George*, plaintiff argues, even if Redelsperger knew that Rios had a gun, he was not justified in shooting Rios if Rios was not doing anything threatening with it. *See also Estate of Lopez ex. rel. Lopez v. Gelhaus*, 871 F.3d 998, 1020 (9th Cir. 2017) (explaining that officer, accused of excessive force in 2013 shooting incident in which victim was walking away from police, then turning while holding an apparent gun, was not entitled to summary judgment on qualified immunity grounds because *George* and like cases establish that "the use of deadly force is unreasonable where the victim does not directly threaten the officer

13

with the gun"). But plaintiff's position as to these cases may be more difficult because in *George* and *Lopez*, unlike here, the shooting victim was not actively fleeing and the officer was not in hot pursuit. Seventh Circuit cases recognize that an officer in a fluid, fast-developing, and chaotic situation that presents a threat of violence to the officer or the public may take decisive action to protect himself and the public, without the need to wait until a gun is actually pointed at him. *Conley-Eaglebear v. Miller*, No. 16-3065, 2017 WL 7116973, at *2 (7th Cir. Sept. 26, 2017) (unpublished order) (affirming summary judgment for officer who shot fleeing suspect from behind when suspect "dr[e]w a gun and beg[a]n to point it in [the officer's direction]"); *see Horton v. Pobjecky*, 883 F.3d 941, 952 (7th Cir. 2018) (officer who shot suspect from behind while suspect was fleeing attempted armed robbery after a struggle did not act unreasonably where, based on what officer knew at the time, "the suspect could have turned and produced a gun in a flash given all the facts and circumstances"); *see also Estate of Valverde by & through Padilla v. Dodge*, 967 F.3d 1049, 1064 (10th Cir. 2020) (declining to follow *Lopez* and *George*); *cf. Weinmann*, 787 F.3d at 450-51.

But the Court need not resolve at this stage precisely how much Redelsperger needed to know or observe of Rios and his revolver during the chase in order to bring this case within at least the "hazy border between excessive and acceptable force," *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (internal quotation marks omitted). A trial is necessary because the jury could reasonably find that Redelsperger did not see the revolver or have reason to know that Rios carried any kind of gun (as opposed to some sort of non-dangerous contraband) and lacked sufficient reason to fear that Rios represented a threat to his safety or the safety of the public. *See Ellis*, 999 F.2d at 247, *Starks*, 5 F.3d at 233-34, *Childs*, 2017 WL 1151049, at *9.

14

The Court notes that this decision does not "foreclose the availability of qualified immunity" to Officer Redelsperger at trial; it merely leaves to a jury the resolution of the disputed facts concerning Redelsperger's knowledge and whether Redelsperger's use of force was reasonable under the circumstances, which will permit this Court to determine, if necessary, whether he is entitled to qualified immunity. *See Strand v. Minchuk*, 910 F.3d 909, 918-19 (7th Cir. 2018) (citing *Warlick v. Cross*, 969 F.2d 303, 305 (7th Cir. 1992) ("When the issue of qualified immunity remains unresolved at the time of trial, as was the case here, the district court may properly use special interrogatories to allow the jury to determine disputed issues of fact upon which the court can base its legal determination of qualified immunity.")).

### C. Wrongful Death

Defendants seek summary judgment on plaintiff's Illinois-law wrongful death claim. *See Evison-Brown v. City of Harvey*, No. 14 C 2927, 2018 WL 6062466, at \*3 (N.D. Ill. Nov. 20, 2018) (describing Illinois statutory basis for such claims). But defendants admit that an Illinois wrongful death claim "is governed by a standard similar to the standard governing Fourth Amendment excessive force claims, meaning that the claims are likely to stand or fall together." *See Williams v. Vill. of Maywood*, No. 13-CV-8001, 2016 WL 4765707, at \*4 (N.D. Ill. Sept. 13, 2016) (citing *Muhammed*, 316 F.3d at 683). The standards are "not identical" because the wrongful death claim requires a showing of willful and wanton conduct, but, as in *Williams v. Village of Maywood*, defendants' summary judgment challenge to both the § 1983 claim and the state-law wrongful death claim "relies on precisely the same disputed premise": that Redelsperger saw the revolver before shooting Rios. *See Williams*, 2016 WL 4765707, at \*4. Because there is a genuine dispute of material fact as to that issue, the wrongful death claim, like the § 1983 claim, survives defendants' motion for summary judgment.

### D. Failure to Intervene

Defendants seek summary judgment on plaintiff's failure to intervene claim against Officer Bellomy. In his response brief, plaintiff expressly agrees that defendants' motion is well-founded as to the failure to intervene claim and declines to defend it. The Court deems the claim abandoned and grants defendants' motion as to that claim.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment [120]. The motion is granted as to the failure to intervene claim against Officer Bellomy, which is dismissed; the motion is otherwise denied. The parties are directed to to exhaust settlement prospects and to meet and confer regarding a schedule for next steps. The parties shall submit a joint status report by April 1, 2021. The Court sets a status hearing for April 6, 2021.

**SO ORDERED.**  **ENTERED: March 3, 2021**

_____
**JORGE L. ALONSO**
**United States District Judge**